IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TYRONE J. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CV274 |
| | ) | |
| v. | ) | |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

Plaintiff, Tyrone Scott ("Scott"), filed this action against his former employer, the Union Pacific Railroad Company ("the Union Pacific"), alleging that the Union Pacific terminated him in violation of the Family and Medical Leave Act ("the FMLA" or the "Act").  Scott seeks reinstatement to his position as a train dispatcher and damages under the FMLA.

A trial to the Court, sitting without a jury, was held on November 28-29, 2005.  The Court, having considered the evidence, the briefs and arguments of counsel, and the applicable law, hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**FINDINGS OF FACT**

**I.   Overview of Scott's Employment at the Union Pacific**

Scott began working at the Union Pacific in 1990 in the train operations department.  In 1998, after holding a series of other positions at the Union Pacific, Scott was hired as a train dispatcher at the Union Pacific's Harriman Dispatch Center ("the

Harriman Center"). Just months after being hired, Scott was promoted to the position of a "super" dispatcher. "Super" dispatchers at the Harriman Center dispatch trains in the most heavily trafficked territories and must be approved by the superintendent to work those territories. Scott remained employed as a super dispatcher at the Harriman Center until his termination in November of 2003.

Scott's job as a train dispatcher was akin to that of an air traffic controller. He was responsible for monitoring train traffic to safely move trains and crews from one location to another. During a typical day, Scott would sit at his work station, which consisted of a 10 foot by 10 foot cubical with a computer terminal, where, using a headset, he would give commands for train movements. Because the trains require constant supervision, Scott was only permitted to leave his work station for minutes at a time and did not have regularly scheduled lunch hours or break times. Scott was, however, permitted to intermittently take short breaks to stretch out, use the restroom, or grab some lunch to bring back to his workstation and eat.

During his tenure at the Harriman Center, Scott established a reputation as being a skilled dispatcher. He was consistently described by his supervisors at trial as being a skilled dispatcher. Moreover, as recent as July 6, 2003, just

-2-

four months prior to his termination, Scott was graded in fifty-four separate categories of job performance and was classified as meeting all expectations.  Notably, however, the performance audit did not grade Scott on his attendance record.

Although Scott's supervisors considered him to be a skilled dispatcher, they did not consider him, due to undependability, to be a good employee.  In the three years preceding his termination, Scott was disciplined for excessive absenteeism on more than one occasion.  Scott was flagged by the database which tracks employee leave in October of 2000 and September of 2002.  On each of those occasions, Joe Fortner ("Fortner"), General Director for Operations Support at the Harriman Center,[1] issued written warnings to Scott mandating an immediate improvement in his attendance.  The October 2000 warning letter contained a concluding paragraph stating:  "If you have a health or medical condition that prevents you from performing service in a consistently dependable manner, you should advise either me or Director of Human Resource Services Don Murray ["Murray"] of that condition."  The September 2002 warning letter also contained a similar paragraph stating:  "If . . . you have a condition for which you may qualify for protected leave under the Family Medical Leave Act, please contact me immediately to make the necessary arrangements."  According to

---

[1] Fortner has since retired from the Union Pacific.

Dr. Dunning, he first saw the plaintiff in connection with his back condition on November 3, 2000. However, plaintiff never advised his employers of this condition until July of 2003, even though he now claims that his excessive use of sick leave during 2000 and 2002 was attributable to his back pain. Nor did he ever respond to the two letters which he received, warning him of excessive use of sick leave.

In July of 2003, he approached Murray to discuss obtaining FMLA certification for his back pain. As a result, he then saw Dr. Dunning for the first time since November 3, 2000. This visit was for the purpose of obtaining a letter from Dr. Dunning to support his FMLA claim. That letter advised that the plaintiff had been diagnosed with spinal stenosis and degenerative disk disease of the lumbar spine.

## II.  Scott's FMLA Certification

Shortly after obtaining this diagnosis, Scott submitted FMLA request and certification forms requesting intermittent FMLA leave. The Union Pacific medical department reviewed Scott's request and approved Scott for intermittent FMLA leave. On July 15, 2003, Murray, the Director of Human Resources at the Harriman Center,[2] notified Scott's supervisors that Scott had been

---

[2] Murray is now the Director of Human Resources Customer Service at the Union Pacific.

approved for intermittent FMLA leave and that he was allowed 2-3 days off per month for his condition.

### III. The Union Pacific's Suspicion that Scott was Pre-Planning Use of His FMLA Leave

In mid-July of 2003, Scott was again flagged by the database tracking employee leave for excessive absenteeism. In addition to issuing Scott a written warning, as had been done on the other two occasions, Randy Glynn ("Glynn"), the Manager of Training Dispatcher at the Harriman Center who was responsible for managing the database tracking employee leave,[3] also reviewed telephone transcripts of personal calls Scott had made from his work station.[4] In reviewing these calls, Glynn discovered that Scott was planning trips to Milwaukee, Wisconsin and Kansas City, Missouri, on regularly scheduled work days when he had only one day of vacation time available.

#### A. The Telephone Conversations

##### 1. The Trip to Wisconsin

On July 22, 2003, the Union Pacific recorded a telephone conversation between Scott and an unknown male that

---

[3] Glynn is now the Senior Manager of Train Dispatchers at the Union Pacific.

[4] Scott was aware that the Union Pacific monitored the telephone conversations he made from his work station as required by federal regulations.

Scott made from the headset at his work station. In this conversation, Scott expressed his intent to take a motorcycle trip from August 29 – September 1, 2003 (Friday – Monday) or August 28-31, 2003 (Thursday – Sunday) to Wisconsin for Harley Davidson's 100th anniversary celebration. On August 18, 2003, the Union Pacific recorded a similar telephone conversation Scott had on his headset with his wife, who was, and continues to be, a Union Pacific employee. In that conversation, Scott discussed his intent to go on the motorcycle trip.

### 2. The Trip to Kansas City

On July 29, 2003, the Union Pacific recorded a telephone conversation between Scott and his wife made from Scott's work station. In this conversation, Scott told his wife that he had requested rest days for her on November 22nd and 23rd so they could attended a Kansas City Chiefs football game on Sunday, November 23, 2003.

### B. The Union Pacific's Decision to Investigate Scott

Glynn reported the content of these calls to Murray. Murray reviewed all of the information and became suspicious that Scott was planning on fraudulently using FMLA leave to extend vacation time. As a result of these suspicions, the Union

Pacific hired private investigator ("PI"), Scott Mitchell, to follow Scott on the days Scott took FMLA leave.[5]

**IV.  Scott's Post-FMLA Certification Absenteeism**

In the five-month period between July and November of 2003, Scott took fourteen intermittent FMLA leave days:

>  July 30, 2003            August 31, 2003
>  July 31, 2003            September 1, 2003
>  August 17, 2003          September 24, 2003
>  August 25, 2003          October 9, 2003
>  August 26, 2003          October 29, 2003
>  August 27, 2003          November 20, 2003
>  August 28, 2003          November 23, 2003

The PI followed Scott on several of these dates including:

>  August 27-28, 2003       October 9, 2003
>  August 31, 2003          October 29, 2003
>  September 1, 2003        November 22-23, 2003
>  September 24, 2003

**A.   Scott's Trip to Wisconsin in Late August**

Scott took FMLA leave from Monday, August 25th through Thursday, August 28th, 2003. The following day, Friday, August 29th, consistent with the recorded telephone conversation discussed *supra*, Scott "trailered it up" to Milwaukee, Wisconsin, for Harley-Davidson's 100th anniversary celebration. Surprisingly, Scott who had been in too much pain to attend work

---

[5] At trial, plaintiff's counsel offered, and the Court received, a Nebraska Supreme Court Opinion captioned *Mitchell v. Douglas Cty. Sheriff's Merit Comm.*, et al., No. 88-412 (June 22, 1990), which the plaintiff introduced to undermine Scott Mitchell's credibility. Having read the opinion, which was written in 1990, and based on events that occurred in 1985 and 1986, the Court finds the events relating to that case are too remote to adversely affect Scott Mitchell's credibility.

that entire workweek, was able-bodied enough, on his first rest day of that week, to endure an eight-hour car ride to Wisconsin. In fact, Scott, who claims he is only able to sit for forty-five (45) minutes at a time while at work, was able to make it to Wisconsin by only stopping every three hours for fifteen (15) to twenty (20) minutes along the way.

Scott stayed in Milwaukee on the 30th, which was his regularly scheduled day off, and the 31st, which he had taken as a vacation day. Scott returned home from Milwaukee the morning of September 1, 2003, and was scheduled to work that day at 2:30 p.m. Scott, however, never went to work on September 1st; he took FMLA leave on that day because his back was killing him, which he states was induced by riding home from Milwaukee with too few breaks. The PI surveilled Scott's home on September 1, 2003, and observed Scott pushing a Harley Davidson motorcycle into the driveway at 12:10 p.m.

### B. Scott is Warned by The Union Pacific for the Consequences of Abusing FMLA Leave.

Scott's use of an FMLA leave day in conjunction with his trip to Wisconsin prompted a warning by the Union Pacific. On September 10, 2003, Scott was called into a meeting with Fortner, and Dennis Faircloth, who was also one of Scott's supervisors. At that meeting, Scott was warned that his FMLA leave was to be used only for his serious medical condition and not for extending vacation time.

    **C.**    **Scott's Use of FMLA Leave on September 24, 2003.**

Scott took FMLA leave on September 24, 2003. On this day, the PI surveilled Scott's home and observed Scott engaging in the following activities from 3:25 p.m. until 5:10 p.m.: (1) pushing a Harley Davidson onto the driveway; (2) washing and drying the motorcycle, which the PI noted required bending and kneeling at several different times and was performed without any apparent difficulty; (3) bending and kneeling to check the carpets of vehicles parked in the driveway; (4) bending and kneeling to place license plates on the vehicles; (5) placing golf clubs into the trunk a vehicle; and (6) bending to wipe the tires and rims down on all four tires of a Yukon.

    **D.**    **Scott's Trip to Kansas City on November 22-23, 2003**

On the morning of Saturday, November 22, 2003, Scott drove to Kansas City, Missouri. Scott testified that he traveled to Kansas City on that day to get his back adjusted by his brother who was attending chiropractic school at the time. Scott, who admittedly had insurance covering chiropractic care and thus could have received care in Omaha without having to endure a car ride to Kansas City, did not offer a cogent explanation as to why he drove all of the way to Kansas City to receive care. Scott's brother adjusted Scott's back in his home and Scott, despite being scheduled to work the next day, stayed overnight at his brother's house. The next day, Scott called the

Union Pacific, from Kansas City, and requested FMLA leave because his back was out. That same day, November 23, 2003, Scott and his brother, who were being followed by the PI, attended the Kansas City Chiefs football game. On cross-examination, Scott, despite having pre-planned the trip to the Chiefs game in the July 2003 telephone conversation, testified that he had no intention of going to the Chiefs game when he drove down to Kansas City that Saturday. He claims that months earlier, he had sold his brother the tickets he had bought for himself and his wife.

### E. Other FMLA Leave Days

During trial, Scott, who also had a license to sell cars, admitted that he may have gone to the Omaha Auto Auction on other days that he took FMLA leave including: July 31st, August 28th, September 25th, and November 20th. The PI observed Scott going into the Omaha Auto Auction on September 25th. Although Scott could not definitively recall during his deposition whether he had attended the Auction on dates he took FMLA leave, the evidence introduced at trial established that Scott was indeed registered as having attended the auction on those days.

### V. The Union Pacific's Decision to Terminate Scott

After reviewing the private investigator's reports, Scott's supervisors concluded that Scott was engaged in activities that were inconsistent with his physician's FMLA

-10-

certification.  This conclusion was based on Scott's repeated use of FMLA days adjacent to rest days, the telephone calls, the private investigator's reports, and the previous warnings given Scott for absenteeism.  Fortner issued Scott a letter terminating his employment on November 25, 2003, for fraudulently using FMLA leave.  This lawsuit ensued.

Scott claims that the Union Pacific's termination of his employment violates the FMLA and was merely pretextual.  He contends that the Union Pacific actually terminated him for engaging in unionization activities.  The Union Pacific contends that Scott is precluded from maintaining this action under the FMLA because Scott was not validly exercising his FMLA rights.

**CONCLUSIONS OF LAW**

**I.   The Family Medical Leave Act**

The FMLA entitles "eligible employees"[6] to a total of twelve (12) workweeks of leave during any 12-month period for a "serious health condition."[7]  29 U.S.C. § 2612.  Upon returning

---

[6] The term "eligible employee" means "an employee who has been employed – (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title: and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).

[7] The term "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential care facility; or (B) continuing treatment by a health care provider."  *Id.* at § 2611(11).

from leave, "any eligible employee who takes leave under [§ 2612] for the intended purpose of the leave shall be entitled . . . to be restored by the employer to the position of employment held by the employee when the leave commenced."  29 U.S.C. § 2614(a)(1)(A).  Employers are prohibited, under the FMLA, from interfering with any right provided under the Act, or from discharging or otherwise discriminating against an employee for opposing any practice made unlawful under the Act.  See 29 U.S.C. § 2615(a)(1), (2).

Prior courts, in interpreting the FMLA, have identified two types of claims for alleged violations of its provisions: (1) interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, *see id.* at § 2615(a)(1), and (2) retaliation claims, in which employers discharge employees for exercising their FMLA right to take leave, *see id.* at §§ 2615(a)(2).  *O'Connor v. PCA Family Health Plan*, 200 F.3d 1349, 1352 (11th Cir. 2000).

Scott's complaint did not specifically characterize his FMLA claim as either an interference and/or a retaliation claim.  However, the parties construed plaintiff's complaint as alleging both an interference and a retaliation claim in the summary judgment and pre-trial briefing.  Moreover, upon an oral inquiry by the Court, just prior to trial, the parties clarified that they would be presenting evidence relating to both theories of

recovery. Accordingly, the Court will address both theories of recovery in this decision.

### A. The Interference Claim

Scott claims that the Union Pacific interfered with his rights under the FMLA by failing to reinstate him to his former position after he returned from intermittent FMLA leave.

An employer interferes with an employee's rights under the FMLA when the employer, *inter alia*, deprives an employee of the FMLA-created right to reinstatement. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955 (10th Cir. 2002) (citing *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999)). To succeed on his interference claim, and thus be entitled to reinstatement, Scott must prove (1) that he was entitled to intermittent leave because of a serious health condition that left him unable to perform the functions of his job; (2) that he took said leave for its intended purpose; and (3) that, upon returning from leave, the Union Pacific refused to restore him to the position he held with the company when the leave commenced. *See* 29 U.S.C. §§ 2612(a)(1)(D),[8]

---

[8] Section 2612(a)(1)(D) provides, in relevant part, "[A]n, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

2614(a)(1)(A);[9] *Jennings v. Mid-American Energy Co.*, 282 F. Supp.2d 954, 961 (S.D. Iowa 2003).  Scott bears the burden of proving each of these elements by a preponderance of the evidence.  *See Smith*, 298 F.3d at 960 (in an interference case, employee must demonstrate, by a preponderance of the evidence, that employee was entitled to disputed leave); *Strickland v. Water Works and Sewer Bd. of City of Birmingham,* 239 F.3d 1199, 1207 (11th Cir. 2001); *Jennings*, 282 F. Supp.2d at 960.  The parties do not dispute that Scott has a serious medical condition that entitled him to FMLA leave or that Scott was denied reinstatement.  The only element of Scott's prima facie case that was disputed at trial was whether Scott was taking FMLA leave for its intended purpose.

In an attempt to satisfy his burden of proof on the "intended purpose" element, Scott's attorney called Scott, Scott's brother, Travis Scott, and Scott's primary treating physician, Dr. Dunning, to the stand.  However, neither Dr. Dunning's nor Travis Scott's testimony provides much assistance on the issue of whether Scott was taking FMLA leave for its intended purpose.  Dr. Dunning reiterated and explained his

---

[9] Section 2614(a)(1)(A) provides, in relevant part, "[A]ny eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave – (A) to be restored by the employer to the position of employment held by the employee when the leave commenced;

diagnoses, which substantiated that Scott was suffering from a serious medical condition.  Beyond that, however, Dr. Dunning was not able to opine, due to the subjectivity of pain, whether the activities Scott admitted to and/or was observed by the PI to be engaging in, were inconsistent with Scott's diagnoses.  Travis Scott's testimony was equally unhelpful.  His testimony merely reiterated what Scott testified about regarding the circumstances surrounding his trip to Kansas City.

The Court finds that the plaintiff was not taking FMLA leave for its intended purpose.  Based on all of the evidence, the Court finds Scott's testimony not credible.  Several facts compel this conclusion: (1) the pre-planned nature of Scott's trips to Kansas City and Wisconsin, the carrying out of the trips as planned, and the fact that Scott took an FMLA leave day in conjunction with both trips; (2) Scott's pattern of taking FMLA days in conjunction with rest days (12 of a total of 14 FMLA days Scott took between July and November were adjacent to or directly connected to rest days); (3) Scott's ability to endure an eight-hour car ride to Wisconsin by stopping every two to three hours, when Scott had been in too much pain to attend work and took FMLA leave for the four consecutive days prior to leaving for Wisconsin; (4) the fact that Scott rode home from Wisconsin, with admittedly too few breaks, on the same day he was scheduled to return to work, knowing that sitting in a car for long periods of

time would aggravate his pain and likely render him unable to work; (5) Scott's apparent ability to engage in the activities surrounding Harley-Davidson's anniversary celebration, despite having endured the trip to Wisconsin with too few breaks, as contrasted to his inability to attend work on the day he rode home from Wisconsin with too few breaks; (6) Scott's ability to engage in the car washing activities the PI observed him engaging in on September 24, 2003, from 3:25 p.m. until 5:10 p.m, when Scott had been in too much pain to attend work at 2:30 p.m., just one hour prior to engaging in those activities; (7) the fact that Scott, who had insurance covering chiropractic care and thus could have received treatment in Omaha, endured a three-hour drive to Kansas City, Missouri, when he claimed he was in extreme pain, to have his back adjusted by his brother; (8) Scott's attendance at a Kansas City Chiefs game just hours after he had called into work to take an FMLA leave day; (9) Scott's testimony that he predominantly chose to use break time to make personal phone calls rather than take the opportunity to stretch out to alleviate his back pain; (10) the fact that Scott, despite having taken so many FMLA days, never returned to see Dr. Dunning, post-diagnoses, for the pain; and (11) Scott's apparent attendance at the Omaha Auto Auction on several days that he took FMLA leave.

      In light of these facts, the Court finds that Scott's testimony that he was taking FMLA leave for its intended purpose

-16-

is not credible and further finds that plaintiff was improperly and fraudulently using FMLA leave for personal time. Consequently, the Court concludes that Scott has not established a prima facie case of interference under the FMLA.

    **B.   The Retaliation Claim**

Scott also alleges that the Union Pacific retaliated against him for exercising his rights under the FMLA. An employee alleging a retaliation claim "must demonstrate that his or her employer intentionally discriminated against him or her in the form of an adverse employment action for having exercised an FMLA right." *Id.*; *Jennings v. Mid-American Energy Co.*, 282 F. Supp.2d 954, 960 (S.D. Iowa 2003) (quoting *Strickland*, 239 F.3d at 1207). In the absence of direct evidence that the employer's actions "were motivated by an impermissible retaliatory or discriminatory animus," as in the present case, courts apply the *McDonnell Douglas* burden-shifting analysis as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (applying *McDonnell Douglas* to FMLA retaliation claim).

Under *McDonnell Douglas*, Scott first bears the burden of establishing a prima facie case of retaliation. To establish a prima facie case of retaliation under the FMLA, Scott must show (1) that he engaged in an activity protected under the Act, (2) that he suffered an adverse employment action, and (3) that there

was a causal connection between his exercise of rights and the adverse employment action. *Id.; McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005). If Scott establishes a prima facie case, the burden shifts to the Union Pacific to prove that it had a legitimate, non-discriminatory reason for taking its adverse employment action. *Smith*, 302 F.3d at 833. If the Union Pacific sustains this burden, the burden shifts back to Scott to prove, by a preponderance of the evidence, that the Union Pacific's proffered explanation is merely pretextual. *Id.*

The Court finds, for the same reasons enumerated earlier in this opinion, that Scott has not made a prima facie showing that he was retaliated against because he engaged in activities protected by the Act.

Alternatively, assuming that Scott was able to establish a prima facie case of retaliation, the Court finds that Scott would be precluded from recovery because the Union Pacific had a legitimate, non-discriminatory reason for terminating Scott's employment. It was not unreasonable for the Union Pacific to infer that an individual with spinal stenosis and degenerative disk disease, who was too symptomatic to attend work, was fraudulently using FMLA leave when that individual was able-bodied enough to participate in the activities which have been enumerated in this opinion. Thus, still assuming that Scott

established a prima facie case of retaliation, the burden now shifts back to Scott to prove that the Union Pacific's proffered reason for terminating Scott's employment was merely pretextual.

Scott argued at trial that his termination was pretextual and that he was actually terminated for engaging in unionization discussions. Scott testified that he was called into a meeting with his supervisors on July 18, 2003, just three days after being approved for FMLA leave, and was informed by his supervisors that his discussions with fellow employees concerning unionization during work hours was inappropriate. Scott further testified that Dennis Faircloth, who was one of his supervisors, approached Scott after the meeting and told him that if he failed to end his union activities, he would find himself the subject of a head-hunt. He argues that the timing of this reprimand, which was issued shortly after Scott was approved for FMLA leave, is strongly suggestive of pretext. The Court disagrees.

There is no evidence in the record which suggests that Scott was terminated for engaging in unionization activities. Three factors compel this conclusion: (1) other than the written reprimand, which merely advised Scott that union discussions during work hours was inappropriate, Scott produced no other evidence relating to union activities; (2) other employees, who were also reprimanded for engaging in unionization discussions, were still employed by Union Pacific; and (3) the overwhelming

-19-

evidence in the record shows that the Union Pacific terminated Scott for abusing FMLA leave, not for engaging in unionization activities. Scott's unsupported contention that he was fired for engaging in unionization activities does not satisfy his burden of proving that his termination was pretextual.

## CONCLUSION

For the foregoing reasons, the Court finds that Scott has not established a prima facie case for interference or retaliation under the FMLA. Moreover, assuming that Scott had established a prima facie case for retaliation, the Court nonetheless finds that Scott would still be precluded from recovering because (1) the Union Pacific had a legitimate, non-discriminatory reason for terminating Scott and (2) Scott failed to sustain his burden of proving that the Union Pacific's proffered reason for terminating his employment was pretextual. Therefore, the Court concludes that Scott is not entitled to reinstatement or damages under the FMLA. Accordingly, a separate order will be entered in accordance with this memorandum opinion.

DATED this 22nd day of December, 2005.

BY THE COURT:

/s/ Lyle E. Strom
_____
LYLE E. STROM, Senior Judge
United States District Court